UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CRESCENT ENERGY
SERVICES, LLC

CIVIL ACTION

NO. 15-819 c/w 15-5783

SECTION: "H"

(Applies to all consolidated matters)

ORDER AND REASONS

Before the Court are five motions for summary judgment on the third-party demand in this matter: (1) Starr Indemnity & Liability Company's ("Starr") Motion for Summary Judgment (Doc. 113); (2) Torus National Insurance Company's ("Torus") Motion for Summary Judgment (Doc. 137); (3) Carrizo Oil & Gas Inc.'s ("Carrizo") Motion for Summary Judgment (Doc. 141); (4) Crescent Energy Services, LLC's ("Crescent") Motion for Partial Summary Judgment (Doc. 167); (5) Liberty Mutual Insurance Company's ("Liberty Mutual") Motion for Summary Judgment (Doc. 169). For the following reasons, the motions filed by Starr, Crescent, and Liberty Mutual are DENIED. The motions filed by Carrizo and Torus are GRANTED.

1

## BACKGROUND

This is a limitation action brought by Crescent Energy Services, LLC ("Crescent") as owner of the S/B OB 808. On February 13, 2015, Claimant Corday Shoulder, a pump operator employed by Crescent aboard the S/B OB 808, was severely injured in a well blowout. Crescent had been hired by Carrizo Oil & Gas, Inc. ("Carrizo") to plug and abandon one of Carrizo's offshore wells. Before the accident, Shoulder attached a piece of pipe to Carrizo's well and screwed the pipe into a flange. When Shoulder began releasing pressure from the well, the pipe separated from the flange, severely injuring Shoulder's leg.

In response to the accident, Crescent filed a limitation of liability action, in which both Shoulder and Carrizo filed claims. In addition, Carrizo has filed a cross claim against Crescent and third-party claims against Crescent's insurers: Liberty Mutual, Starr, Torus, and Lloyd's of London. Carrizo alleges that it is entitled to contractual indemnity from Crescent and coverage as an additional insured from Crescent's insurers pursuant to its contract with Crescent. Shoulder has likewise filed a third-party complaint against the aforementioned insurance companies.

In these cross motions for summary judgment Starr, Liberty Mutual, and Crescent (collectively, "Movants") argue that Crescent's contract with Carrizo is a non-maritime contract and therefore Louisiana law applies to prohibit the indemnity provisions therein. Carrizo responds, filing its own motion for summary judgment, arguing that the contract is maritime in nature, and therefore governed by general maritime law, rendering the indemnity clause therein enforceable. In addition, Torus has filed a motion for summary judgment on other grounds, arguing that it is not an insurer of Carrizo because

Carrizo was not a borrowing employer of Shoulder. This Court will address each argument in turn.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[3] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[4] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[5] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[6] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the

---

[1] Fed. R. Civ. P. 56(c) (2012).
[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[3] *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 532 (5th Cir. 1997).
[4] *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).
[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
[6] *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

necessary facts."[7]  Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[8]

## LAW AND ANALYSIS

### A. Maritime or Non-Maritime Contract

The issue in this matter is which law applies to the contracts at issue here: general maritime law or Louisiana law.  Under general maritime law, indemnity agreements are enforceable. Under Louisiana's Oilfield Anti-Indemnity Act, however, provisions for indemnity contained in agreements pertaining to wells for oil, gas, or water are void and unenforceable.  Accordingly, this Court must determine whether the contract between Carrizo and Crescent is a maritime or non-maritime contract.

A contract is maritime if it has a "genuinely salty flavor."[9] "Determination of the nature of a contract depends in part on historical treatment in the jurisprudence and in part on a fact-specific inquiry."[10]  In *Davis & Sons, Inc. v. Gulf Oil Corp.*, the Fifth Circuit indicated that, in addition to looking at the historical jurisprudential treatment of similar contracts, courts should consider six factors in making such a fact-specific determination:

> 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the

---

[7] *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).
[8] *Boudreaux v. Banctec, Inc.*, 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[9] *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961)
[10] *Davis & Sons, Inc. v Gulf Oil Corp*, 919 F.2d 313, 316 (5th Cir. 1990).

injured worker? and 6) what work was the injured worker actually doing at the time of injury?[11]

At the outset, the Court must look more closely at the contract at issue here. Prior to beginning the plug and abandon work, the parties entered into a Master Service Agreement ("MSA"), a blanket contract governing all of the dealings between Crescent and Carrizo. It contains an indemnity obligation in which Crescent agreed to indemnify Carrizo for injuries sustained by employees of Crescent. The MSA also requires Crescent to add Carrizo as an additional insured. In addition to the MSA, the work performed by Crescent was done pursuant to a Turnkey Bid. The Turnkey Bid discussed the specifics of the plug and abandon work to be performed by Crescent on three of Carrizo's wells located in Louisiana waters. It also listed the equipment that Crescent would provide to complete the job, including a quarter barge, tug, and cargo barge. The Fifth Circuit has stated, "If, as in this case, the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable to the interpretation and enforceability of the contract's provisions."[12] Accordingly, both the MSA and the Turnkey Bid (collectively, "the Contract") must be considered together in interpreting whether maritime or state law applies.

That said, the Court first looks to the historical treatment of the types of activities governed by the Contract at issue here. The discussions of past courts regarding whether contracts involving oil and gas operations on navigable waters are maritime or non-maritime is anything but clear. Indeed,

---

[11] *Id.* at 316.
[12] *Id.* at 315.

5

some courts have referred to this area of law as a "marshland."[13]  The parties on both sides of this issue raise compelling arguments.

On one hand, Carrizo points to the following facts to support a finding that the Contract is maritime.  In order to perform the plug and abandon work, Crescent needed the support of the three vessels identified in the Turnkey Bid.  One of the vessels, the OB 808, was specifically designed to plug and abandon inland wells and served as a work platform outfitted with all of the equipment necessary to perform plug and abandon work, including a crane that was permanently affixed to the barge.  The plug and abandon equipment was operated from the barge during the entire project and was never moved to the well platform.  In addition, the crew lived and slept on the barge during the project.  With the assistance of the tug, the OB 808 moved back and forth between the three wells on which it was working nearly 30 times during the project.  At the conclusion of the project, parts of the platform are removed and placed on one of the barges to be transported to shore.

Given these facts, Carrizo relies on cases stating that a contract is maritime when the work being performed is "more than incidentally related to the execution of the vessel's mission."[14]  The vessel's mission here was to plug and abandon Carrizo's wells, which Carrizo argues could not have been performed without the use of a vessel.  Carrizo also points out that the Contract specifically called for the use of vessels to complete the project.[15]

On the other hand, Movants point to facts indicating that the Contract is non-maritime.  First, Movants argue that the procedure of plugging and abandoning a well is exactly the same whether the well is located on land or

---

[13] *Baloney v. Ensco Offshore Co.*, 570 F. App'x 423, 426 (5th Cir. 2014).
[14] *See id.*; *Clay v. ENSCO Offshore Co.*, No. 14-2508, 2015 WL 7296787, at *6 (E.D. La. Nov. 18, 2015).
[15] *See Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538 (5th Cir. 1986).

on water. They point out that the equipment and crew utilized in the project were the same that would be used if the plug and abandon work occurred on land. They argue that the OB 808, which was spudded in place while work was being performed, served merely as a work platform. Movants argue that the sole purpose of the Contract was oil and gas related and that it lacks any "salty flavor," in light of the single mention of the vessels to be used. They point out that most of the steps in the plug and abandon process involve wireline services, which courts have deemed a non-maritime activity used in the oil and gas industry.

To support their argument, Movants rely heavily on *Thurmond v. Delta Well Surveyors*.[16] In *Thurmond*, the Court held that a contract to perform wireline services for a well in navigable waters was non-maritime.[17] The Court held that although the contract contained "incidental maritime obligations," the primary obligation of the contract was to perform wireline services, a non-maritime activity.[18] The Movants argue that here the principal obligation of the Contract was to plug and abandon, and the majority of the work done in plugging and abandoning the wells was wireline services. They argue that because the Fifth Circuit in *Thurmond* has definitively determined that wireline services are a non-maritime activity, a non-maritime holding is likewise compelled here.

This Court holds, however, that *Thurmond* is distinguishable from the issue here. In *Thurmond*, the court distinguishes the wireline services contract from prior cases, pointing out that the wireline services contract "did not address in any way the use of a ship."[19] Conversely, the Turnkey Bid here

---

[16] *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988).
[17] *Id.* at 952.
[18] *Id.*
[19] *Id.* at 955.

7

clearly indicates that three vessels will be supplied and used in the completion of the plug and abandon project.  Other cases have distinguished *Thurmond* for this reason as well, stating that the contract in *Thurmond* called solely for the performance of wireline services and was a "special-purpose contract."[20] Here, the contract is much broader and provides for much more than just wireline services.

To the contrary, this Court finds the reasoning in *Clay v. ENSCO Offshore Company* more compelling.[21]  In *Clay*, Schlumberger Technology Corporation was contracted to provide wireline and plug and abandon services on a semi-submersible drilling vessel.[22]  The plaintiff was injured while conducting plug and abandon services.[23]  As here, both parties could point to authority supporting their positions, but the court held that a finding that the contract was a maritime contract had the stronger argument "because the crew was assigned to work aboard a vessel in navigable waters and the work being performed was more than incidentally related to the execution of the vessel's mission."[24]  It further stated, "In sum, Clay was injured aboard the vessel while working as part of the vessel crew to enable the special-purpose vessel to perform the function for which that vessel was designed."[25]  It held therefore that the contract to enable the vessel to complete its drilling mission was maritime in nature.[26]

Here too, the plug and abandon crew was assigned to the OB 808 to perform the plug and abandon operations required by the Contract. The mission of the OB 808 was indisputably to complete the plug and abandon

---

[20] *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1086 (5th Cir. 1990).
[21] *Clay*, 2015 WL 7296787.
[22] *Id.* at *1.
[23] *Id.*
[24] *Id.* at *5.
[25] *Id.* at *6.
[26] *Id.*

8

project outlined in the Contract. The crew was, therefore, working on a vessel specifically designed for plug and abandon work to "perform the function for which that vessel was designed."[27] *Clay* provides a compelling argument that the Contract at issue here is maritime.

Second, this Court is persuaded by the analysis in *Davis & Sons, Inc. v. Gulf Oil Corp.*[28] In *Davis*, the plaintiff was killed while working as a supervisor on a special-purpose spud barge, which served as a mobile maintenance unit for the many wells in Black Bay Field.[29] On the day of the accident, the barge was spudded down adjacent to a fixed platform while the crew performed repair work on the well.[30] The court held that the contract by which the plaintiff's employer had agreed to provide "labor and general contracting services" was maritime.[31] The court noted, "The particular nature of the terrain and production equipment involved required a special purpose vessel like Barge 11171 that could function as a mobile work platform. Its transportation function was more than 'merely incidental' to its primary purpose of serving as a work platform."[32] The mission of the vessel was to serve as a mobile maintenance unit, and the work done by the crew was calculated to fulfill this mission.[33] The court concluded that "[t]he work done by the crew of the Barge 11171 was inextricably intertwined with maritime activities since it required the use of a vessel and its crew."[34]

Here too, it would not have been possible to plug and abandon Carrizo's wells without the use of a vessel as a work platform. The equipment utilized

---

[27] *Id.*
[28] *Davis*, 919 F.2d 313.
[29] *Id.* at 314.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 317.
[33] *Id.*
[34] *Id.*

9

in plugging and abandoning the wells could not have been moved on to the well platform and must have been operated out of a vessel. In addition, the transportation function of the vessel was necessary to move from well to well. Under the analysis in *Davis*, the work done by the crew of the OB 808 was inextricably intertwined with maritime activities.

Although the case law leads this Court to favor a holding that the Contract is maritime, the historical treatment of this issue is far from settled. "Because Fifth Circuit precedent has not unambiguously established that plugging and abandoning activities related to wireline operations in a contract for drilling services are always either maritime or non-maritime, the fact intensive inquiry as to the nature of the work performed is appropriate."[35] This Court will therefore consider the *Davis* factors as well.

The first factor requires the Court to consider the work order in effect at the time of the contract. The Turnkey Bid outlined the plug and abandon work to be performed by Crescent and required it to provide three vessels, a crew, and specialized equipment to plug and abandon Carrizo's wells.

Under the second factor the Court must analyze what work was actually performed by the crew assigned under the contract. The crew was assigned to perform oil and gas services aboard the vessel, including wireline services and plug and abandon operations.

Third, the Court must look to whether the crew was assigned to work aboard a vessel in navigable waters. The crew was assigned to work aboard the OB 808 in navigable waters. They slept, ate, and maintained their equipment aboard the barge. No party seriously disputes that the OB 808, a spud barge, is a vessel.

---

[35] *Clay*, 2015 WL 7296787, at *5.

The fourth factor asks the Court to consider to what extent the work being done is related to the mission of the vessel. The mission of the vessel was to plug and abandon Carrizo's wells. The work of the crew was directly related to this mission.

The fifth factor directs the Court to consider the principal work of the injured worker. Shoulder was a pump operator in connection with the plug and abandon operations aboard the OB 808.

The sixth and final factor directs the Court to consider what work the injured worker was performing at the time of the injury. At the time of his injury, Shoulder was engaged in a step of the plug and abandon operation. Specifically, he was releasing pressure from the well.

After considering each of the *Davis* factors as well as prior case law, this Court holds that the Contract is maritime in nature. The plug and abandon operations defined in the Contract were inextricably related to the mission of the OB 808, giving the Contract the requisite salty flavor. The operations performed under the Contract could not have been performed without the use of a vessel. The vessel's mission was to plug and abandon Carrizo's wells and its crew was working toward this mission. For these reasons, general maritime law applies to the MSA, and the indemnity provision is enforceable.

## II. Borrowed Employer

Next, Defendant Torus, Crescent's employer liability insurer, alleges that it does not owe indemnity or coverage to Carrizo because Carrizo was not a borrowing employer of Shoulder at the time of the accident. Torus insures Crescent under a Workers' Compensation and Employer's Liability Policy, which gives coverage under an "alternate employer" endorsement, stating that: "This endorsement applies only with respect to bodily injury to your employees

11

while in the course of special or temporary employment by the alternate employer." Torus argues that because Carrizo was not the borrowing employer of Shoulder, it cannot receive coverage under this "special and temporary employment" language.

Carrizo does not contest that it was not a borrowing employer of Shoulder or that it cannot be found liable under any theory of Jones Act negligence or unseaworthiness. Instead, it argues that such a finding does not foreclose the possibility that it could recover under Crescent's policy with Torus. Carrizo argues that Torus's motion is premature because Shoulder's seaman status has not yet been adjudicated by this Court and is disputed by Crescent. It points out that Shoulder's claims are broad enough to potentially include liability on the part of Carrizo under the Longshore & Harbor Worker's Compensation Act (LHWCA) if Shoulder is ultimately adjudicated a longshoreman. It also argues that because a LHWCA claim is not unambiguously excluded from coverage, Torus has a duty to defend Carrizo on the entire lawsuit.

Subsequent to the filing of Carrizo's opposition, however, Crescent indicated in discovery responses that it does not dispute Shoulder's seaman status.[36] There is therefore no dispute that Shoulder is a seaman and therefore has no claim under the LHWCA. Carrizo has not indicated any other claim for which Torus's policy may provide coverage. Accordingly, Carrizo is not an insured under Torus's policy with Crescent, and it therefore need not provide coverage or defense to Carrizo.

Carrizo has asked this Court to, in its adjudication of Torus's motion, make certain findings regarding claims against Carrizo. Specifically, it seeks a holding that Carrizo did not exercise operational control over the Crescent

---

[36] *See* Doc. 160.

crew, that it is not vicariously liable for any of the actions of the Crescent crew, and that it has no owner *pro hac vice* liability. With these requests, Carrizo attempts to obtain certain favorable rulings regarding claims against it while still retaining Torus as a potential insurer on other claims. This Court declines this invitation. In order to obtain such a ruling, Carrizo must properly move for such relief and allow opposition from all interested parties. Carrizo cannot, as it has attempted to do here, have its cake and eat it too. In granting Torus's motion, this Court merely holds that Torus does not owe coverage or defense to Carrizo under Crescent's Maritime Employer's Liability policy.

## CONCLUSION

For the foregoing reasons, the motions filed by Starr, Crescent, and Liberty Mutual are DENIED. The motions filed by Carrizo and Torus are GRANTED. All of Carrizo's claims against Torus are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana this 7th day of November, 2016.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**